## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 05-10140-RGS** |
| | ) | |
| **THOMAS M. FINNERAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### Government's Opposition to Media Companies'
### Motions to Intervene
### And to Vacate Protective Order

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this opposition to motions filed by the Globe Newspaper, Inc. ("the Globe"), the Associated Press, and the Boston Herald, Inc. (collectively the "Media Companies") to intervene in this criminal action, and the Media Companies' joint motion to vacate or modify the Court's protective order dated July 13, 2005 ("Protective Order").   In sum, the Media Companies are not parties to the instant action and the Federal Rules of Criminal Procedure do not permit the intervention of third parties in a criminal case. Moreover, there is neither a common law right nor a constitutional right of public access to discovery in a criminal case, which might otherwise permit the Media Companies to press their claim in the instant action.  Therefore, the Media Companies have no standing to challenge the Protective Order entered on July 13, 2005, and the Court should summarily deny the Media Companies' motions.

Even if the Court were to reach the merits of the Media Companies' claim, it should deny the joint motion to vacate or modify the Protective Order because that order was properly entered pursuant to Fed.R.Crim.P. 16(d)(1) (protective orders on discovery matters) and Local

Rule 116 (automatic discovery in criminal cases), was consistent with the Court's authority under Local Rule 83.2B (permitting appropriate special orders in widely publicized criminal cases), and furthered the objectives set forth in Local Rule 83.2A (restricting public comment by attorneys in criminal cases).  Moreover, the Protective Order reflects the parties' agreement to expedite the discovery process while insuring that discovery materials produced by the government are used only for the legal defense of the defendant; this agreement not only substantially furthers the interests of justice in the instant case but provides a limited prophylaxis designed to ensure the parties' right to a fair trial and an impartial jury.  The Protective Order does not impinge upon a recognized constitutional or common law right asserted by the Media Companies; it exclusively concerns the use to which defense counsel may put documents and information obtained directly from the government in the enhanced automatic discovery employed in this case.

## **Background**

On June 6, 2005, a grand jury returned an indictment against Thomas M. Finneran, the former Speaker of the Massachusetts House of Representatives. [Doc.No.1].  That indictment charges Finneran with three counts of perjury and one count of obstruction of justice in connection with his deposition testimony and trial testimony in a civil case captioned Black Political Task Force v. Galvin , District of Massachusetts, Civil Number A 02-11190.  Id.

At the time of the indictment, Finneran was one of the most well-known public figures in Massachusetts.  He had served in the state legislature for more than 20 years.  From 1996 until the fall of 2004, Finneran served as the Speaker of the House.  Because of his prominent political position and his style of governing the House of Representatives, Finneran was routinely

featured in local and regional news stories.

Prior to the indictment and during the course of the government's investigation, there was substantial speculation in the media that Finneran was the subject of a grand jury investigation. See Exhibit 1. From shortly after a decision by a three judge panel of this Court in February 2004 which was critical of Finneran's testimony in the <u>Black Political Task Force</u> case, until his indictment in June 2005, there were numerous media accounts citing sources who had allegedly testified in the grand jury. Id. The ultimate indictment was the subject of intense media interest, including stories on the front pages of Boston's newspapers and the lead stories on local broadcast outlets. Id.

On July 13, 2005, as part of the automatic discovery process, the government and the defendant filed a joint motion for a Protective Order. [Doc.No.8].[1] That motion, which appended a proposed order, sought to ensure that the documents and the information contained therein which were to be disclosed to the defendant by the United States would be used only for the defendant's legal defense. Id. The motion also sought to ensure that the documents provided to the defendant by the government were not disseminated by those individuals assisting in his defense or those individuals interviewed by the defendant's team in preparation for trial. Id.

While not so stated in the joint motion, it was the government's intention to disclose to the defendant under that Protective Order a substantial amount of discovery material before the government's obligation to produce such discovery arose under applicable law.[2] In particular, it

---

[1] A copy of the motion and the proposed order are attached as Exhibit 2.

[2] Attached as Exhibit 3 is an affidavit which provides a general outline of the documents produced to the defendant to date. If the Court reaches the merits of the Media Companies' motion to vacate and seeks a more detailed factual record of the documents disclosed to the

was the government's intention to disclose under that Protective Order the core Jencks material –

which included a substantial portion of the grand jury investigation, including transcripts of the

testimony of core witnesses and related grand jury documents, and witness interviews – long

before the government was required by law to disclose such material.[3]  Thus, the entry of the

Protective Order had the salutary effect of permitting the government to make early disclosures

of discovery material, including grand jury information, to the defendant for the preparation of

his defense substantially in advance of trial, while also providing some assurance to the

government that the information would only be used as necessary for the defendant's legal

defense.  Moreover, it remains in both parties' interest to ensure that potential jurors are not

prejudiced by pretrial publicity caused by the selective release of discovery material, and that

potential trial witnesses are not subject to pressure regarding their anticipated testimony.

The Court executed the Protective Order on July 13, 2005. [Doc.No.9].  In accordance

with that order, counsel for the defendant executed affirmations of receipt and compliance with

the order on July 15, 2005 and July 28, 2005.  By letter dated July 28, 2005, the government

made its enhanced automatic discovery disclosure to the defendant which included more than

30,000 pages of documents as well as videotapes, audiotapes, compact disks, floppy disks, and

computer hard drives.  [Doc.No.11].  The substantial majority of this evidence disclosed to the

defendant was grand jury material covered by Fed.R.Crim.P. 6(e).

---

defendant under the Protective Order, the government requests leave to file such an affidavit *in
camera.*

[3]  Because the government has yet to finalize it list of trial witnesses and exhibits, it is
likely that the disclosure made to the defendant under the Protective Order includes documents
which the government would not have a legal obligation to produce to the defendant.

The Globe filed a motion to intervene and a motion to vacate or modify the protective

order on July 26, 2005. [Doc.No.13, 14]. The Associated Press filed a motion to intervene and

joined in the Globe's motion to vacate or modify on July 27, 2005. [Doc.No.15]. The Boston

Herald, Inc. filed a motion to intervene and joined the Globe's motion to vacate or modify on

August 23, 2005. [Doc.No.18].

## Argument

### I.     The Media Companies Lack Standing to Intervene and Do Not Otherwise Have a Right of Public Access to Criminal Discovery Documents.

The Media Companies are not parties to this criminal action and lack standing to

intervene in order to challenge the Protective Order. The Media Companies fail to cite a single

case or applicable rule which holds that a member of the public has the ability to intervene in a

criminal proceeding for the purpose of obtaining discovery material provided by the government

to the defendant. Moreover, the government is unaware of any such case. The Court should

therefore summarily deny the Media Companies' motions to intervene, and reject their related

motion to vacate or modify the Protective Order.

While courts have recognized that a member of the public may contest a protective order

issued in a criminal or civil case which infringes on a constitutional or common law right of

public access to court records or hearings, the public has no right to discovery material which

has not been filed with the Court or relied upon in some judicial proceeding. Indeed many courts

– including this Court – have concluded that the public does not have a cognizable right of

access to documents obtained by a party solely through discovery afforded by applicable civil or

criminal rules, when those documents have not become part of the judicial record. See, e.g.,

United States v. Salemme, Crim.No. 04-10323-RGS (D.Mass. August 22, 2005) *Order on*

*Continued Sealing of an FBI Report Dated October 7, 2004* at fn.2 (". . . there is no First Amendment right of public access to the criminal discovery process in a pending case."); In re Boston Herald, Inc., 321 F.3d 174, 180 (1st Cir. 2002)("Both the constitutional and the common law rights of access have applied only to judicial documents."); Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984) ("[P]retrial depositions and interrogatories are not public components of a civil trial . . . restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information"); In re Associated Press, 162 F.3d 503, 512 (7th Cir.1998) ("it is well established that discovered but not-yet-admitted evidence is not ordinarily within the scope of press access"); United States v. Wolfson, 55 F.3d 58, 60 (2d Cir. 1995) (no public right of access to documents submitted to court *in camera* as part of discovery dispute); Grove Fresh Distrib., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897-98 (7th Cir.1994) ("until admitted into the record, material uncovered during pretrial discovery is ordinarily not within the scope of press access."); see also Public Citizen v. Liggett Group, 858 F.2d 775, 780 (1st Cir.1988) ("Certainly the public has no right to demand access to discovery materials which are solely in the hands of private party litigants.").

Since there is no public right of access to discovery material in criminal cases, and the Protective Order challenged by the Media Companies deals exclusively with discovery material provided by the government in the pretrial phase of this case, there is no ground on which a member of the public can intervene and attack that Protective Order.  While the First Circuit has yet to decide this issue definitively, it has noted that "the right of a non-party to intervene in a criminal proceeding is doubtful." United States v. Hurley, 920 F.2d 88, 90 (1st Cir. 1990).

The two cases relied upon by the Media Companies provide no support for their motions

to intervene in this case.  In In re Boston Herald, Inc., the First Circuit did not address the issue

of whether the Herald had properly intervened; it simply mentioned that the Herald had been

permitted to intervene by the district court, without reference to any objection by the

government.  321 F.3d at 177.  Even still, the claim brought in that case – that the public right of

access extended to documents filed by the defendant with the court to establish that he did not

have sufficient funds to retain his own attorney – was premised on longstanding common law

and constitutional rights of access to judicial records in criminal cases.  Id.  As such, it was

necessary for the district court and the First Circuit to evaluate whether the records fell within

that widely recognized right and, if so, whether the defendant's countervailing privacy interests

outweighed that right of access.  Id. 191.  By contrast, it is well-established that there is no

public right of access to criminal discovery material.  See supra at 5-6.[4]  Thus, there is no need

for this Court to engage in a balancing of competing rights which is necessary in cases where

parties are seeking judicial records.  See, e.g., In re Providence Journal Company, Inc., 293 F.3d

1, 13 (1st Cir. 2002)(balancing constitutional right of public access against accused's Sixth

Amendment right to a fair trial).

Likewise, the First Circuit in In re Globe Newspaper Co., 729 F.2d 47 (1st Cir. 1984),

declined to hold that there is a basis for a member of the public to intervene in a criminal case for

the purpose of seeking to open a bail hearing which the magistrate judge intended to close.  "We

have not decided – nor do we now – whether a media representative may, absent a rule for

intervention analogous to Fed.R.Civ.P. 24, 'intervene' in a criminal action for the purpose of

---

[4]  Even if there were such a right of public access to discovery material, that right could not extend to discovery provided by the government in advance of its obligations under law pursuant to an agreement between the parties, as it was in this case.

appealing a closure order." Id. at 50 fn.2.  Thus, In re Globe Newspaper provides no support for the Media Companies' motions to intervene in this case.  In fact, like the petitioner in In re Boston Herald, the petitioner in In re Globe Newspaper Co. was seeking to enforce well-recognized rights of public access to a pretrial proceeding, rather than to challenge a protective order which addresses only documents for which there is no public right of access.

In the absence of a rule permitting a member of the public to intervene in a criminal case, or the assertion of a recognized common law or constitutional right of public access which could otherwise not be vindicated, there is no basis for permitting the Media Companies to intervene and challenge the Protective Order entered in this case.  Therefore, the motions should be summarily denied.

## II.    The Protective Order Was Properly Entered and Is Not Overly Broad.

Even if the Court were to permit the Media Companies to intervene, it should reject the Media Companies' motion to vacate or modify the Protective Order.  The Protective Order was properly entered pursuant to Fed.R.Crim.P. 16[5] and Local Rule 116[6], was consistent with the

---

[5]    Fed.R.Crim.P. 16(d)(1) reads in pertinent part:

> **Protective and Modifying Orders**. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.

[6]    Local Rule 116 generally addresses the automatic discovery process under which the government discloses discovery material to a defendant.  Among other things, Local Rule 116 provides for a streamlined discovery process, a mechanism by which the government can decline to provide evidence to the defendant, and a mechanism by which the government can seek a protective order from making disclosures under the automatic discovery process.  In the absence of the Protective Order entered in this case, the government could have sought protection from certain disclosures under Local Rule 116.6.  The entry of the Protective Order not only expedited the government's disclosure of evidence to the defendant, but obviated the need for the government to exercise its rights under Local Rule 116.6 with respect to many documents.

Court's authority under Local Rule 83.2B[7], and furthered the objectives outlined in Local Rule 83.2A.[8]  The Protective Order was the product of a joint motion of the parties and reflected an agreement between the parties which permitted the defendant to obtain from the government early disclosure of core Jencks material and other evidence, including grand jury material, while insuring that this discovery would not be used for an improper purpose or inadvertently disclosed to any person who is not participating in the defendant's legal defense.  Moreover, given the extensive media coverage of this matter to date, the Protective Order furthers both parties' right to a fair trial and an impartial jury: it substantially reduces the likelihood that witnesses who testified in the grand jury will be subject to inappropriate influences prior to testifying at trial; and it reduces the likelihood of prejudicial pretrial publicity caused by the selective release of evidence, including grand jury testimony and documents obtained through grand jury subpoena.

While neither the joint motion nor the Protective Order recited the facts giving rise to the

---

[7]  Local Rule 83.2B reads in pertinent part:

> In a widely publicized or sensational criminal or civil case, the court, on motion of either party or on its own motion, may issue a special order governing such matters . . . likely to interfere with the rights of the accused or the litigants to a fair trial by an impartial jury . . . and any other matters which the court may deem appropriate for inclusion in such an order.

[8]  Local Rule 83.2A reads in pertinent part:

> No lawyer or law firm shall release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with the pending or imminent criminal litigation with which he or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

need for such an order, it was evident to the Court from the extensive publicity regarding the investigation and indictment of the defendant that this is a "widely publicized or sensational criminal or civil case," falling squarely within Local Rule 83.2B.  See Exhibit 1.  As such, the Court is permitted to enter orders which it "deem[s] appropriate" in such cases, and in order to for ensure the litigants' right to a fair trial and an impartial jury.  See Local Rule 83.2B.  Moreover, it is not fatal to the Protective Order that the facts giving rise to it are not cited by the Court;  when the parties agree that there are substantial benefits to the entry of such an order, make a joint motion for an order, and it is clear to the Court that the matter has been widely publicized, the recitation of such facts is not essential.  See, e.g., In re Special Proceedings, 373 F.3d 37, 45 (1st Cir. 2004)(rejecting claim that a protective order entered after a joint motion is unlawful for its failure to make findings on the need for the order).  The Court could readily infer from the joint nature of the motion, the language of the motion itself, and the extensive press coverage of this case that the requested order was appropriate.  Id.

Even if the Court accepts the Media Companies' argument that the entry of a protective order in this case required a showing of "good cause," the parties could readily make such a showing.[9]  First, as set forth above, the great majority of the material turned over to the

---

[9]  The Media Companies argue that the Supreme Court's holding in Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984) requires the district court to make a finding of "good cause" before entering an order which restricts the dissemination of discovery material.  Globe Memorandum at 7-10.  In Seattle Times, the Supreme Court upheld an order which prohibited the dissemination of civil discovery material, concluding that "the unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders." 467 U.S. at 36.  The Court went on to conclude that where "a protective order is entered on a showing of good cause, **as required by Rule 26(c),** is limited to the context of pretrial discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment."  Id. at 37 (emphasis added).  This holding did not impose a general requirement on all protective orders entered in civil and criminal cases, as

defendant under the Protective Order was evidence obtained through the grand jury process,

including transcripts of witnesses who testified before the grand jury, and documents produced

to the grand jury from numerous sources. As the First Circuit noted in In re Boston Herald, Inc.,

"[c]ourts have . . . held that no right of access applies to some . . . types of proceedings and

documents. The paradigmatic example is the grand jury, whose proceedings are conducted in

secret." 321 F.3d at 183. Thus, given that the great majority of the documents covered by the

Protective Order are grand jury materials, and there is no public right of access to those materials

at any point in time, there was more than "good cause" to enter the Protective Order. Moreover,

based upon recent history, there is every reason to believe if they obtain access to such materials,

the Media Companies will publicize them widely without regard to the defendant's or the

government's right to a fair trial and an impartial jury.[10]

     Second, as noted above, the Protective Order was agreed to by the parties as a mechanism

for the government to provide the defendant with substantial evidence in advance of its

_____

argued by the Media Companies. Rather, it simply confirmed that the district court had met the
applicable standard in Fed.R.Civ.P. 26. In this case, the analogous criminal provision in
Fed.R.Crim.P. 16(d)(1) also permits the entering of a protective order "for good cause."
However, it imposes no requirement that the Court make a specific finding of good cause. In
addition, Local Rule 83.2B permits a special order either on the Court's conclusion that
sensational media coverage is "likely to interfere with the rights . . . of the litigants to a fair trial
by an impartial jury," or as the Court "may deem appropriate." See Local Rule 83.2B.

    [10]  See, e.g., Boston Globe, December 3, 2002, at A1, *Bulger Stand: Loyal to Brother,
Testified they Spoke in '95; Saw No Duty to Assist in Capture* (revealing leaked federal grand
jury transcript); Boston Herald, August 22, 2005, at 1, 4-5, '*Obsessed' Feds, Report: They
pressured mob witness in rush to convict agent* (revealing FBI 302 which was under Court seal);
Boston Herald, August 23, 2005, at 6, *Judge probes leak of FBI debriefing* (revealing portion of
FBI 302 placed under seal by Court). These articles are attached as Exhibit 4.

obligations under applicable law.[11]  This early disclosure of evidence to the defendant

substantially advances the interests of justice in this case because it allows the defendant

additional time to prepare his case, it permits the parties sufficient time to brief the essential

issues before trial of this matter, and it avoids delays that might occur in the trial were

voluminous amounts of Jencks material  provided to the defendant a short time before trial.

The government was willing to make such an advance disclosure of evidence only on the

defendant's assurance that the materials would be used exclusively for his legal defense, and that

substantial efforts would be made to prevent any (intentional or inadvertent) disclosure of the

materials.  In the absence of the Protective Order, the government would not have disclosed a

significant portion of the material until it was required to do so by Fed.R.Crim.P. 16 and the

Local Rules.  In addition, in the absence of disclosure to the defendant under the Protective

Order, neither the Media Companies nor any other members of the public would have access to

these materials.  See In re Boston Herald, 321 F.3d at 180 ("There is no general constitutional

right of access to information in the government's possession," citing Houchins v. KQED, Inc.,

438 U.S. 1, 15 (1978)(plurality opinion)).

The government insisted on such protections before making early disclosure because of

the intense media interest in this case, and the possibility that potential witnesses could be

subject to pressure – whether political or economic – to alter their testimony before trial.[12]  The

---

[11]  For instance, the government has disclosed core Jencks material to the defendant under the Protective Order.  The government has no obligation to do so until after a witness testifies at trial.  See 18 U.S.C. §3500.

[12]  The government makes no claim that the defendant or his counsel would undertake efforts to pressure potential witnesses.  However, given that the defendant is a public figure with some standing in the community, individuals who view his prosecution unfavorably have a

government also insisted on these protections to better ensure its right to a fair trial and an impartial jury. Thus, the Protective Order reflects a balance reached by the parties which permits the defendant the greatest opportunity to prepare his defense, while providing the government some assurance that the material disclosed will not be used to further sensationalize the case, or be misused by third parties. Thus, the "good cause" for the issuance of the Protective Order is in part the advance disclosure by the government of a substantial amount of discovery information.

Third, given the intense media interest in the case, there was good cause to believe that the early or selective release to the public of the evidence provided by the government – such as the grand jury transcripts or reports of interview – was likely to interfere with the litigants' right to a fair trial and an impartial jury. While the voir dire process may ferret out potential jurors who are biased, voir dire is imperfect and is ordinarily quite limited in this Court. Thus, the Protective Order provides an appropriate prophylaxis to the misuse of discovery material which could prejudice potential jurors, and the Protective Order is designed to prevent the harm rather than simply react to a harm already incurred. See, e.g., In re Providence Journal Company, Inc., 293 F.3d at 14 (noting that "a high-profile criminal case may impose unique demands on the trial court, and require the court to establish procedures for dealing effectively, efficiently and fairly with recurring issues" and approving the trial court's order designed to safeguard rights before they were violated)(quotations and citations omitted). While the Media Companies appear to suggest that restrictions on the release of discovery material are only permissible after there has

_____

strong incentive to exercise either subtle or overt pressure on potential witnesses to undermine evidence of the defendant's guilt.

13

been a demonstration of harm to the defendant's right to a fair trial, such an argument is plainly

inconsistent with <u>Seattle Times</u>, which found "good cause" for restrictions based on the potential

economic harm to a party in a civil case, 467 U.S. at 26-27, and is inconsistent with Local Rule

83.2B, which contemplates the imposition of special orders to prevent harm to a litigants' rights.

The Media Companies press the Court to vacate the Protective Order or limit its

applicability to only those documents the disclosure of which would "create a substantial

likelihood of material prejudice to the defendant's fair trial rights." <u>Globe Memorandum</u> at 2.

The Court should reject this argument because it seeks to impose a substantially higher standard

than the "good cause" standard set forth in Fed.R.Crim.P. 16(d)(1), the "appropriate" standard

set forth in Local Rule 83.2B, and the "good cause" standard upheld by the Supreme Court in

<u>Seattle Times</u>, 467 U.S. at 37.  Moreover, a standard which focuses exclusively on "the

defendant's fair trial rights" fails to recognize the panoply of other rights, interests, and

considerations which are at stake when courts impose protective orders regarding discovery,

including, among others,  the government's right as a litigant in this case to a fair trial and an

impartial jury, the need to protect grand jury secrecy, the interest of the defendant in obtaining

the early disclosure of the government's evidence, and the interest of the defendant and potential

witnesses in the privacy of personal information which may be contained in discovery material.[13]

In addition, at this early stage of the case it may be difficult for the Court to fully assess what

particular piece of evidence the release of which would create a "substantial likelihood of

---

[13]  For instance, in this case the government obtained the personal and professional
calendars of a number of potential witnesses.  Those witnesses have a substantial and legitimate
privacy interest in keeping those calendars from public disclosure, particularly if they will not be
introduced as evidence at trial.

material prejudice."

The Media Companies assert that this Court should impose a higher standard for the entry of a protective order in a criminal case than a civil case because a criminal prosecution is "substantially more weighty than . . . [a] civil case." Globe Memorandum at 6. This argument directly contravenes the "good cause" standard in Fed.R.Crim.P. 16(d)(1), and the "appropriate" standard in Local Rule 83.2B. Moreover, the fact that a criminal prosecution exposes an individual to the loss of his liberty is all the more reason to have a lower, rather than higher standard for the issuance of protective orders. Unlike in a civil case, a defendant's right to a fair trial is a paramount right, which is frequently cited for limiting the public right of access to judicial records and court proceedings. See, e.g., In re Providence Journal Company, Inc., 293 F.3d at 13; In re Globe Newspaper Co., 729 F.2d at 53. In addition, in criminal discovery matters the Court must, among other things, address the need to preserve grand jury secrecy, to ensure the protection of witnesses from retribution, and protect the privacy of third parties (particularly in the case of electronic interceptions pursuant to 18 U.S.C. §2518). These many rights and interests which weigh against the public release of discovery material in a criminal case argue for a lower rather than a higher standard for protective orders.

The Media Companies' claim that the Court should vacate the Protective Order because it requires the defendant to "quietly suffer the government's public charge of wrongdoing" must also be rejected. Globe Memorandum at 4. First, the Media Companies are in no position to assert the defendant's rights; the defendant is represented in this case and jointly moved for the Protective Order. It was clear to the defendant that his ability to prepare for trial would be substantially enhanced by the additional discovery material received under the Protective Order.

Moreover, the Protective Order does not restrict the defendant's right to speak about the case; it simply prevents him from using the evidence which he has been provided by the government under the Protective Order for a purpose other than his legal defense.

The notion that a member of the media is in a better position, or is better able, to protect the defendant's right to a fair trial or right to free speech, than is the defendant or his counsel is nonsensical. For instance, the Media Companies' claim that the defendant may change his mind after the Protective Order is entered, and that the media is needed to protect him from a fickle assertion of his constitutional rights, completely fails to account for the fact that the defendant can move to modify the Protective Order at any time. It also fails to account for the fact that the defendant has not objected to the Protective Order, and has already substantially benefitted by its entry.

The Media Companies are plainly attempting to press their true claim – that there should be a public right of access to criminal discovery material – under the guise of protecting the defendant's rights. As set forth above, courts have routinely declined to find a public right of access to discovery material, either in common law or in the Constitution, and the Media Companies' claim should be rejected. See supra at 5-6. To the extent that the defendant's First Amendment rights are implicated, it should be left to him to assert those rights.

Finally, the Media Companies' alternative proposition, that the Protective Order should be modified so that it does not prohibit the dissemination of information obtained from sources other than the government discovery materials, is unnecessary. The Protective Order is narrowly drawn to restrict the use of documents, and information contained therein, provided by the government to the defendant. If that same information is obtained from another source, the

16

Protective Order does not impose any restrictions on the dissemination or publication of that information.[14] To the extent that the Court determines that the Protective Order lacks clarity on this issue, the government has no objection to a limited modification to make such a clarification.[15]

### Conclusion

The Media Companies lack standing to intervene in this criminal case and their motions should be summarily denied. This Court should reject the Media Companies' attempt to cloak their interests in obtaining criminal discovery material under the guise of protecting or enhancing the defendant's rights.

Even if the Court chooses to review the merits of the Media Companies' claims, it should uphold the Protective Order. That order substantially advances the interests of justice in this case by permitting the government to make early disclosure of discovery material while ensuring the litigants' right to a fair trial and an impartial jury. There is ample basis to conclude that the Protective Order is appropriate under Local Rule 83.2B, and that it is based on "good

---

[14] Of course, whatever the source of the information, the defendant and his counsel remain bound by the restrictions in Local Rule 83.2A and related rules of professional conduct. See, e.g., Massachusetts Rule of Professional Conduct 3.6.

[15] In the event that the Court were to find some larger infirmity with the Protective Order, the government should be permitted to enforce the terms of the order against the defendant as an equitable matter, as it was only through this mechanism that the government made early disclosures of core Jencks and other evidence.

17

cause" under Fed.R.Crim.P. 16(d)(1).

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Date: August 26, 2005                     By:  /s/John T. McNeil
                                          JOHN T. MCNEIL
                                          Assistant U.S. Attorney

18

## NEWSPAPER CLIPPING INDEX

|    | DATE | NEWSPAPER AND TITLE | LOCATION |
|----|------|---------------------|----------|
| 1. | 02/29/2004 | The Boston Globe<br>"Obstruction to Justice" | City & Region<br>B1 – Opinion |
| 2. | 03/10/2004 | The Boston Globe<br>"Group Urges Investigation<br>Of Finneran" | City & Region<br>Section B1 |
| 3. | 03/10/2004 | The Boston Herald<br>"Group Urges Finneran<br>Perjury Probe" | Page 27 |
| 4. | 03/26/2004 | The Boston Globe<br>"Speaking in Blanks" | City & Region<br>Section B1 |
| 5. | 04/15/2004 | The Boston Globe<br>"US probes drawing of<br>Mass. Districts" | Front Page |
| 6. | 04/15/2004 | The Boston Herald<br>"Feds Open Criminal Probe<br>into Massachusetts redistricting" | Local/Regional |
| 7. | 04/15/2004 | The New York Times<br>"Feds Probe Massachusetts<br>Redistricting" | Associated<br>Press |
| 8. | 04/16/2004 | The Boston Herald<br>"Tommy Finds the Truth<br>Taxing" - Howie Carr | Page 20<br>Opinion |
| 9. | 04/16/2004 | The Boston Herald<br>"Probers Fishing for<br>Fibbing by Finneran" | Local/Regional |
| 10. | 04/16/2004 | The Boston Globe<br>"Finneran Actions Focus<br>Of US Subpoena" | Front Page |
| 11. | 04/16/2004 | The Boston Globe<br>"Powerful Speaker Confronts<br>New Kind of Challenge in<br>Federal Court" | Boston.com |

12.  04/17/2004    <u>The Boston Globe</u>          Boston.com
                   "In Finneran Case,
                   An Unusual Course"

13.  04/17/2004    <u>The Boston Herald</u>         Local/Regional
                   "Dems Doubt Finneran's          Opinion
                   Testimony"

14.  04/19/2004    <u>The Boston Globe</u>          Boston.com
                   "Finneran's Focus Doubted       Opinion
                   Amid Redistricting Probe"

15.  04/19/2004    <u>The Boston Herald</u>         Page 7
                   "Mr. Speaker, Maybe             Opinion
                   Martha Has Room for Two"
                   Joe Sciacca

16.  04/19/2004    <u>The Boston Herald</u>         Page 7
                   "Finneran Perjury a
                   Tough Sell"

17.  04/25/2004    <u>The Boston Globe</u>          Boston.com
                   "US Redistricting Probe         B1
                   Puts Close Finneran Ally in
                   Hot Seat"

18.  04/29/2004    <u>The Boston Herald</u>         Page 8
                   "Fed Gavel Over His Head        Opinion
                   Leaves Speaker Speechless"
                   Mike Barnicle

19.  05/04/2004    <u>The Boston Globe</u>          Front Page
                   "Finneran Lobs a
                   Preemptive Strike"

20.  05/04/2004    <u>The Boston Globe</u>          City & Region
                   "Lawyer for Speaker has         B5
                   Bulldog Reputation"

21.  05/04/2004    <u>The Boston Herald</u>         Local/Regional
                   "Finneran Says He's
                   Paying Own Legal Bill"

22.  05/05/2004    <u>The Boston Herald</u>         Page 14
                   "Too Bad for Tommy Taxes        Opinion
                   He Can't Lobby Jury Vote"
                   Howie Carr

23.  05/14-20/2004 <u>The Boston Phoenix</u>        On line
                   "Speaker On The Spot"

| 24. | 05/19/2004 | The Boston Globe<br>"US Investigators Seize<br>State House Records in<br>Finneran Probe" | Boston.com |
| 25. | 05/19/2004 | TheBostonChannel.com<br>"Feds Seize Senate Records<br>In Redistricting Probe" | Channel 5 |
| 26. | 05/24/2004 | The Boston Globe<br>"FBI Seen Querying on<br>Finneran" | Boston.com |
| 27. | 05/25/2004 | The Boston Herald<br>"Software Missing in Probe<br>Of Finneran" | Local/Regional |
| 28. | 09/08/2004 | The Boston Globe<br>"Finneran Used Campaign<br>Funds in Probe Defense" | Boston.com |
| 29. | 09/10/2004 | The Boston Phoenix<br>"Speaker on The Spot<br>(Continued)" | On line |
| 30. | 09/27/2004 | The Boston Herald<br>"Tom On Probe: Leave It<br>To The Lawyers" | Local/Regional |
| 31. | 09/27/2004 | The Boston Globe<br>"Finneran Set for New Post<br>Amid Probe" | Boston.com |
| 32. | 11/19/2004 | The Boston Herald<br>"Finneran's Gone As Speaker<br>But Perjury Probe won't Quit" | |
| 33. | 12/02/2004 | The Boston Globe<br>"Ex-Finneran Aides Face<br>Grand Jury" | City & Region<br>B1 |
| 34. | 12/03/2004 | The Boston Globe<br>"Judge had 2 roles in<br>Finneran Case" | City & Region<br>B1 |
| 35. | 01/14/2005 | The Boston Herald<br>"U.S. Attorney: Finneran<br>Departure Won't Halt Probe" | Local Politics<br>Page 8 |

36.  03/05/2005     The Boston Globe          Front Page
                    "Federal Probe of
                    Finneran Expands"

37.  03/06/2005     The Boston Herald         Local Politics
                    "Dems on Sullivan's Case:
                    Finneran a trophy target"

38.  03/09/2005     The Boston Herald         Local Politics
                    "Rep: Finneran Knew About
                    Redistricting: Revelation Casts
                    Doubt on Speaker's Testimony"

39.  03/22/2005     The Boston Herald         Page 2
                    "Fed Grand Jury Closes In
                    On Finneran's Top Allies"

40.  03/22/2005     The Boston Herald         Local Politics
                    "Three Days that Could Decide
                    'King Tom's' Fate"

41.  03/24/2005     The Boston Herald         Page 22
                    "This Time Tommy Taxes        Opinion
                    May Have Outsmarted Himself"
                    Howie Carr

42.  05/06/2005     The Boston Globe          Front Page
                    "Indictment of Finneran
                    Is Expected"

43.  05/06/2005     The Boston Herald         Nat'l Politics
                    "Prosecutors Preparing to
                    Indict Former House Speaker"

44.  05/07/2005     The Boston Globe          Boston.com
                    "Finneran Says He's
                    Not Worried"

45.  05/07/2005     The Boston Herald         Business Today
                    "Mass. Biotechnology Council
                    Sticks by Finneran - so far"

46.  05/07/2005     The Boston Herald         On line
                    "Feds May Have No Option On
                    Indictment of Finneran"

47.  05/10/2005     The Boston Globe          Boston.com
                    "Cooking Finneran's Goose"    Opinion
                     Joan Vennochi

48.  05/10/2005     The Boston Globe                Boston.com
                    "Words of Wisdom for           Letter
                    Two Toms"

49.  05/20/2005     The Boston Globe                Boston.com
                    "Despite Legal Clouds,
                    Finneran Keeps It Light"

50.  05/25/2005     The Boston Herald              Business Today
                    "'I Did Not Do Anything
                    Wrong': Ex-House Chief Finneran
                    Won't Quit MBC Even If Indicted"

51.  06/06/2005     The Boston Herald              Local Politics
                    "Former House Speaker Charged
                    In Redistricting Probe"

52.  06/06/2005     TheBostonChannel.Com          Channel 5
                    "Former House Speaker
                    Indicted"

53.  06/06/2005     The Boston Globe                Boston.com
                    "Grand Jury Indicts Finneran"

54.  06/07/2005     The Patriot Ledger            On line
                    "Finneran's Fight: Victim of
                    Witch Hunt, or Liar Who Must
                    Pay?"

55.  06/07/2005     The Boston Herald              Opinion
                    "Finneran's Foes Have a
                    Field Day"

56.  06/07/2005     The Boston Herald              Nat'l Politics
                    "Troubled Testimony"

57.  06/07/2005     The Boston Herald              Nat'l Politics
                    "Will He Get Prison Time?"

58.  06/07/2005     The Boston Herald              Nat'l Politics
                    "Liberal Dose of Defiance
                    Trips Up Former Leader"

59.   06/07/2005    The Boston Herald              Nat'l Politics
                    "Ex-Speaker: Is Attorney
                    Just playing Politics?"

60.  06/07/2005     The Boston Herald              Nat'l Politics
                    "Finneran Vows: I'll Beat
                    Federal Rap"

| | | | |
|---|---|---|---|
| 61. | 06/07/2005 | The Boston Globe "Shock, Satisfaction Greet Finneran Indictment" | Boston.com |
| 62. | 06/07/2005 | The Boston Globe "Grand Jury Indicts Finneran: Defense May Hinge on Intent" | Boston.com |
| 63. | 06/07/2005 | The Boston Globe "Specialists Call Cases Uncommon, Often Hard to Prove" | Boston.com |
| 64. | 06/07/2005 | The Boston Globe "Demanding the Truth" Brian McGrory | Boston.com Opinion |
| 65. | 06/07/2005 | The Boston Globe "Ex-Speaker Faces Obstruction, Perjury Charges in US Probe" | First Section |
| 66. | 06/07/2005 | The Boston Herald "Finneran's Foes Have A Field Day" | Editorial |
| 67. | 06/07/2005 | Metro "Finneran Indicted" | Front Page |
| 68. | 06/08/2005 | The Boston Herald "Common Cause Took Aim At Tom" Howie Carr | Page 8 Opinion |
| 69. | 06/08/2005 | The Boston Herald "Finneran Haters Get Their Way" Rachelle Cohen | Page 29 Opinion |
| 70. | 06/08/2005 | The Boston Herald | Editorial Cartoon |
| 71. | 06/08/2005 | The Boston Globe | Editorial Cartoon |
| 72. | 06/08/2005 | The Boston Globe "The (Flimsy) Case Against Finneran" Scot Lehigh | Page A19 Opinion |

73.  06/08/2005     <u>The Boston Herald</u>          Page 8
                    "Power Tripped:              Opinion
                    Finneran Only Has Self
                    To Blame"
                    Howie Carr

74.  06/08/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Finneran Says He's
                    Looking Forward To Day in
                    Court"

75.  06/09/2005     <u>The Boston Herald</u>          Nat'l Politics
                    "Group Takes Up Cause
                    Against U.S. Attorney's Office"

76.  06/09/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Self-Inflicted Damage"     Opinion
                    Adrian Walker

77.  06/09/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Finneran's Gathering Storm"

78.  06/09/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Finneran's New Venue"      Editorial

79.  06/10/2005     <u>The Boston Herald</u>          Page 37
                    "Truth Be Told, Indictment   Opinion
                    Justified"
                    Wayne Woodlief

80.  06/13/2005     <u>TheBostonChannel.com</u>       Channel 5
                    "Finneran Faces Court Appearance
                    In Redistricting Probe"

81.  06/13/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "A misuse of Court's        Letter
                    Resources"

82.  06/14/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Finneran Latest Target
                    For 'Maximum Mike'"

83.  06/14/2005     <u>The Boston Globe</u>           <u>Boston.com</u>
                    "Ex-Mass. House Speaker
                    Pleads Innocent"

84.  06/14/2005     <u>The Boston Herald</u>          Nat'l Politics
                    "Finneran Pleads Innocent
                    To Perjury Charges"

85.  06/14/2005   <u>The Boston Globe</u>        <u>Boston.com</u>
                  "Finneran Pleads Innocent    B5
                  To Perjury Charges"

86.  06/15/2005   <u>The Boston Globe</u>        <u>Boston.com</u>
                  "Confident, Solemn Finneran
                  Pleads Not Guilty to Perjury"

87.  06/15/2005   <u>The Boston Herald</u>       Page 4
                  "Finneran Pleads Not Guilty,
                  As Lawyer Rips U.S. Attorney"

88.  06/15/2005   <u>The Boston Herald</u>       Page 4
                  "For Tommy, This Really       Opinion
                  Smarts"
                  Peter Gelzinis

89.  06/16/2005   <u>The Boston Globe</u>        <u>Boston.com</u>
                  "Finneran's Artful Dodging"   Opinion
                  Joan Vennochi

90.  06/17/2005   <u>The Boston Herald</u>       Page 27
                  "What Executive Privilege!"   Opinion
                  Howard Manly

91.  06/24/2005   <u>The Boston Phoenix</u>      On line
                  "Finneran's Wake"

92.  07/14/2005   <u>The Boston Herald</u>       Page 28
                  "Judge Quashes Leaks in
                  Finneran Case"

93.  07/20/2005   <u>The Boston Globe</u>        <u>Boston.com</u>
                  "Finneran Case Moving
                  Slowly at 30,000 Documents
                  To Be Reviewed"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 05-10140-RGS** |
| | ) | |
| THOMAS M. FINNERAN | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT  MOTION FOR PROTECTIVE ORDER**

The United States of America, by and through Assistant United States Attorney John T.
McNeil, and the defendant THOMAS M. FINNERAN, by and through counsel, move the Court
pursuant to Fed.R.Crim.P. 16 and  Local Rule 116, to issue a protective order in the form
attached hereto, restricting the use and dissemination of documents, and the contents thereof,
which will be provided to the defendant by the United States for the sole purpose of the legal
defense of this case.  Accordingly, the parties respectfully request that the Court enter a
protective order in the form attached.

Respectfully Submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By:  /s/ John T. McNeil
JOHN T.  McNEIL
Assistant U.S. Attorney
(617) 748-3252

/s/ Richard M. Egbert
RICHARD M. EGBERT
Counsel for Defendant
(617) 737-8222

Dated: July 12, 2005

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 05-10140-RGS** |
| | ) | |
| **THOMAS M. FINNERAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PROTECTIVE ORDER

Motion having been made by the parties pursuant to Fed.R.Crim.P. 16 and Local Rule 116 for a protective order which prohibits the disclosure of documents, and information contained therein, except for the purpose of the legal defense of the case captioned above, and which also restricts the disclosure of documents to certain individuals engaged in the defense of this case, it is hereby ORDERED as follows:

1.    With respect to all documents, and information contained therein, disclosed by the government to defense counsel of record under this Order, defense counsel of record may further disclose such documents, or information contained therein, only for the purpose of the legal defense of the case captioned above. Defense counsel of record may disclose such documents, and information contained therein, to the following individuals:

    a.    members of defense counsels' offices who are directly engaged in assisting the legal defense of this case (defined to include partners, associates, and employees of defense counsels' law firms, including secretaries and paralegals);

    b.    other persons retained by defense counsel of record for the purpose of assisting in the legal defense of this case, such as private investigators and experts;

    c.    the defendant; and

    d.     potential witnesses for the legal defense of this matter, provided that defense counsel of record have made a good-faith determination that such disclosure is necessary to the proper preparation of the legal defense of this case.  However, copies of such documents shall only be shown, and shall not be given, to such witnesses.

    2.     Prior to disclosing any documents, or information contained therein, to any person defense counsel of record shall fully explain the terms of this Order and obtain from each person to whom such disclosure is made, an acknowledgment of the terms of this Order and their agreement to comply with its terms.  Each person to whom disclosure is made shall endorse a copy of this Order, and defense counsel of record shall file such an endorsed copy with the Court.  In the event that a potential witness declines to execute a copy of this Order, defense counsel of record shall file notice with the Court that such a disclosure has been made and that the named potential witness has been informed of the content of the Order.  Such filings shall be filed under seal and *ex parte*.  The government shall have access to these filings only upon motion to the Court and good cause shown.

    3.     Those persons acting as agents of defense counsel of record, defined as those individuals identified in Paragraphs 1.a. and 1.b., may disclose documents, or information contained therein, produced by the government under this Order, to potential witnesses on the following conditions:

    a.     such disclosure may only be for the purpose of the legal defense of the case;

    b.     such disclosure may only be made after good-faith determination that such disclosure is necessary to the proper preparation of the legal defense of this case;

    c.     such disclosure shall be made only after the potential witness has been advised of

the existence of this Order, agrees to comply with this Order, and executes a copy

of this Order. In the event the potential witness declines to execute a copy of this

Order, defense counsel of record shall file notice with the Court that such a

disclosure has been made and that the named potential witness has been informed

of the content of the Order; and

d.    potential witnesses may be shown copies of documents covered by this Order,

but may not be provided copies of such documents.

4.    Only defense counsel of record and their agents (as defined in Paragraphs 1.a. and

1.b.) may disseminate documents, or information contained therein, which have been disclosed

by the government under this Order. Neither the defendant, nor any other person receiving such

documents or information contained therein, is permitted to disseminate or disclose such

documents or information for any purpose at any time.

5.    This Order shall take effect, and the government shall produce discovery covered

by this Order, only after acknowledged and countersigned copies of this Order have been filed

with the Court by defense counsel of record.

_____          _____

DATE

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 05-10140-RGS** |
| | ) | |
| THOMAS M. FINNERAN, | ) | |
| | ) | |
| Defendant. | ) | |

### Declaration of John T. McNeil

I, John T. McNeil, aver the following to be true and correct to the best of my knowledge:

1.    I am an Assistant United States Attorney and represent the United States of America in the criminal matter captioned above.

2.    Prior to filing the Joint Motion for Protective Order [Doc.No.8], I informed counsel for the defendant that the government was willing to provide advance disclosure of core Jencks material and other evidence – including grand jury transcripts, grand jury exhibits, and documents obtained by grand jury subpoena – on the condition that the defendant agree that he would only use the discovery material provided by the government for the purpose of his legal defense, and on the agreement that precautions would be employed to prevent the disclosure of the discovery to any person not engaged in the defendant's legal defense.  In the absence of an agreement with regard to the use and disclosure of this discovery material, the government was unwilling to make disclosures of evidence in advance of its obligation under law.  In addition, the government was also willing to disclose in discovery under a protective order certain investigative material which the

1

government may not have had any obligation to disclose. Again, in absence of a protective order, the government would not have disclosed those materials until it was so obligated under law. The parties then negotiated the language which ultimately resulted in the proposed protective order submitted to the Court.

3.    After the entry of the Protective Order and defense counsel's compliance with Paragraph 5 of that order, by letter dated July 28, 2005, I disclosed eleven boxes of discovery material to the defendant through counsel. Those boxes contained approximately 34,000 documents, as well as audiotapes, compact disks (containing audio files and document files), floppy disks (containing document files), videotapes, and computer hard drives. Approximately 90% of the material disclosed to the defendant was directly derived from the grand jury investigation; that material includes documents and other media received through grand jury subpoena, transcripts of testimony in the grand jury, and grand jury exhibits. A significant portion of the remaining documents disclosed under the Protective Order were derivative of the grand jury investigation. In addition, some portion of that remaining material contained information which implicated third parties' privacy interests.

Signed this 26th day of August, 2005 under the pains and penalties of perjury.

John T. McNeil
Assistant United States Attorney

2

Citation                    Search Result        Rank 2 of 20        Database
12/3/02 BOSTONG A1                                                    BOSTONG

12/3/02 Boston Globe A1
2002 WLNR 2556194

Boston Globe (MA)
Copyright (c) 2002, Globe Newspaper Company

December 3, 2002

Section: Metro/Region

BULGER STAND: LOYAL TO BROTHER TESTIFIED THEY SPOKE IN '95; SAW NO DUTY TO
ASSIST IN CAPTURE

Shelley Murphy, Globe Staff

University of Massachusetts President **William** M. **Bulger** testified before a
federal **grand jury** last year that he spoke to his fugitive brother, James
"Whitey" **Bulger**, once since the gangster fled to evade federal racketeering
charges, but that he felt no obligation to help authorities capture him,
according to a transcript of the secret court proceedings obtained by the Globe.

**William Bulger**, a lawyer who was president of the Massachusetts Senate when
he talked to his brother in January 1995, said his brother was seeking legal
advice. He said he didn't urge him to surrender to authorities "because I don't
think it would be in his interest to do so."

Bulger said he talked to his brother on only that one occasion, nearly eight
years ago, and does not know where he is hiding.

Assistant US Attorney James Herbert, who questioned Bulger for two hours
before the grand jury, asked, "So just to be clear, you felt more loyalty to
your brother than you did to the people of the Commonwealth of Massachusetts?"

"I never thought of it that way," Bulger responded. "But I do have an honest
loyalty to my brother, and I care about him, and I know that that's not welcome
news, but . . . it's my hope that I'm never helpful to anyone against him . . .
I don't feel an obligation to help everyone to catch him."

The brothers spoke in January 1995 - the month that James **Bulger** was charged
with running a criminal empire that rivaled the local Mafia - in a prearranged
telephone call to the Quincy home of a friend, according to a copy of **William
Bulger's testimony** before the **grand jury** on April 5, 2001. **Bulger** was granted
immunity in his **grand jury testimony**, meaning he will not face criminal charges
for being in contact with his brother while he was on the run.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/3/02 BOSTONG A1

   A congressional committee investigating the FBI's relationship with James **Bulger** and other longtime FBI informants issued a subpoena yesterday ordering **William Bulger,** 68, to testify Friday at a committee hearing in Boston about his fugitive brother.

   In a phone call yesterday with Globe columnist Brian McGrory about the subpoena, **Bulger** said of his brother, "I wish we had been closer . . . I care deeply for him, and might have been an influence for the better." The column appears in today's City & Region section.

   The subpoena was delivered to **William Bulger's** lawyer, Thomas R. Kiley, after he made it clear that **Bulger** would not appear voluntarily. "I'm truly outraged that people are all of a sudden talking about what occurred in the **grand jury,**" Kiley said yesterday. "It's a violation of law that should be investigated."

   Refusing to comment on the specifics of **William Bulger's testimony** or his admitted telephone call with his fugitive brother, Kiley said, "I don't want to compound somebody else's sin. There is a breach of the rules. They're timed for a particular purpose. It is outrageous and it calls into question the objectivity of the upcoming proceedings."

   Kiley wouldn't say whether **William Bulger** will show up Friday, but added that he is researching the law on congressional subpoenas and contempt.

   When asked why **William Bulger** was reluctant to testify, Kiley made a reference to another **Bulger** brother, John, who is awaiting trial on perjury charges for allegedly lying to a federal **grand jury** about his fugitive brother.

   "No person in the **Bulger** family who has witnessed what has happened to Jackie can be enthused about an appearance," Kiley said.

   Congressional subpoenas carry the full force of law and are difficult to quash. If **Bulger** ignores the summons from the US House Committee on Government Reform, he could be found in contempt and face imprisonment.

   Blain Rethmeier, a committee spokesman, would not say what questions the panel planned to put to **Bulger**. But he said the committee expected **Bulger** to comply with its order to appear.

   "I don't think there's any course to quash the subpoena," Rethmeier said. "If Mr. **Bulger** does not appear on Friday, he runs the risk of being held in contempt of Congress."

   The committee scheduled an extra hearing for Friday to accommodate **Bulger** after his lawyer said he had a scheduling conflict on Thursday, the day the committee had originally planned to question him.

   US Representative Dan Burton, an Indiana Republican, has led the Government

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

12/3/02 BOSTONG A1

Reform Committee on an aggressive investigation of ties between the Boston FBI
office and its organized crime informants, including James **Bulger** and Stephen
"The Rifleman" Flemmi.

James **Bulger**, 73, is on the FBI's Ten Most Wanted List with a $1 million
reward for his capture, and is charged with 22 murders.

The congressional committee has notified **William Bulger** that it would like to
question him about his relationship with the FBI. James **Bulger's** longtime
handler, retired FBI agent John J. Connolly Jr., was convicted in May of
racketeering for tipping off Whitey **Bulger** to investigations and warning him to
flee on the eve of his 1995 indictment. Connolly, who grew up in the same South
Boston housing projects as the **Bulgers**, was mentored by **William Bulger** as a
child.

When questioned by the federal **grand jury**, **William Bulger** acknowledged that
he and Connolly had discussed his brother's case following the indictment, but
said he couldn't remember what they talked about - other than that Connolly
insisted his brother had been wrongly accused of drug trafficking.

The **grand jury**, sitting in US District Court in Boston, was investigating
potential criminal charges against those who either helped James **Bulger** elude
capture or undermined the government's efforts to catch him. But since **William
Bulger** was granted immunity, he cannot face any criminal charges based on his
**testimony**, as long as it was truthful.

**Bulger** told the **grand jury** that he hadn't seen his brother since December
1994, the month before his indictment.

Recounting the January 1995 telephone call with his brother, **William Bulger**
said, "Well, I told him that I hoped that the publicity didn't have any basis in
fact."

James **Bulger** assured him that some of the "dramatic elements" in the
indictment, which alleged he had been shaking down legitimate businessmen, along
with drug dealers and bookies, weren't true, said **William Bulger**.  He added that
his older brother told him "that he would be alright."

**William Bulger** said he had arranged to receive the telephone call at the home
of a trusted friend because he assumed that federal investigators had tapped his
own telephones.

**Bulger** told the **grand jury** that he had offered his gangster brother "legal
advice" during the telephone call, but refused to disclose what advice he had
passed along, citing attorney-client privilege.

During his two-hour appearance before the **grand jury**, **William Bulger** said his
brother's former deputy, Kevin J. Weeks, would come by his South Boston home

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

12/3/02 BOSTONG A1

every couple of weeks to "share with me whatever he was hearing or learning" about his brother.

**William Bulger** said he didn't think Weeks told him where his brother was hiding out, although he added, "there's something about New York that sounds familiar . . . ."

"For the most part, he'd be telling me that he looked good, and . . . his spirits are good," **William Bulger** told the **grand jury.**

He added that other people who had received telephone calls from his brother also told him that he was doing fine.

**William Bulger** said his brother "seemed to have called folks, but he never, as far as I know, ever sought me out."

**William Bulger** said he couldnt' recall the names of the people his brother had called because "it's my custom to talk to everyone."

**William Bulger** has rarely spoken about his brother, who spent nine years in federal prisons, including Alcatraz in the 1950s and 1960s.  While **William Bulger** rose to the top of Massachusetts politics, his brother became one of the most powerful crime bosses in the state.

James **Bulger's** decades-long relationship with the Boston FBI came to attention again this spring during the trial of  Connolly, who is now serving a 10-year prison term for colluding with James **Bulger.** In trial **testimony,** admitted hitman John Martorano said that **William Bulger** - at the time a rising star in Massachusetts state politics - asked Connolly to "just keep my brother out of trouble."

Both Connolly and **William Bulger** issued statements at the time denying Martorano's claim.

After James **Bulger's** indictment in January 1995, the US Department of Justice eventually convened a special task force to investigate the FBI's mishandling of **Bulger** and Flemmi.

If **Bulger** refuses to testify Friday, bringing a contempt charge would involve a complicated parliamentary process, since Congress is not in session.

Charles Johnson, the US House parliamentarian, said the Government Reform Committee would have to have a majority vote of the 44-member committee to file contempt charges, which would then be forwarded to the speaker of the House. The speaker would then have the discretion to forward the charges to federal prosecutors.

Shelley Murphy can be reached at shmurphy@globe.com.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

12/3/02 BOSTONG A1

PHOTO

 WILLIAM M. BULGER Said he did not know hiding place

Thanassis Cambanis of the Globe staff contributed to this report.\   TYPE: MET

---- INDEX REFERENCES ----

COMPANY: GLOBE GROUP; UNIVERSITY OF MASSACHUSETTS

NEWS SUBJECT:  (Violent Crime (1VI27); Crime (1CR87); Social Issues (1SO05);
Legislation (1LE97); Government (1GO80))

REGION:  (Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England
(1NE37); North America (1NO39))

Language:  EN

OTHER INDEXING:  (ALCATRAZ; BOSTON; BOSTON FBI; CONGRESS; FBI; GLOBE; GOVERNMENT
REFORM COMMITTEE; HOUSE; HOUSE COMMITTEE; INDIANA REPUBLICAN; MASSACHUSETTS;
MASSACHUSETTS SENATE; PHOTO; REPRESENTATIVE DAN BURTON; GLOBE (THE); UNIVERSITY
OF MASSACHUSETTS; US DEPARTMENT OF JUSTICE; US HOUSE)  (Assistant; Blain
Rethmeier; Brian McGrory; Bulger; BULGER STAND; Bulgers; Charles Johnson;
Connolly; Flemmi; James Bulger; James Herbert; John; John J. Connolly Jr.; John
Martorano; Kevin J. Weeks; Kiley; Martorano; Rethmeier; Shelley Murphy;
Thanassis Cambanis; Thomas R. Kiley; William Bulger; William M. Bulger)  (NAME -
BULGER )

EDITION: THIRD

Word Count: 1845
12/3/02 BOSTONG A1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/3/02 BOSTONG A1

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

## 4094267 - OBRIEN,CONSTANCE

| | | |
|---|---|---|
| Date and Time Printing Started: | 08/26/2005 | 09:31:03 am (Central) |
| Date and Time Printing Ended: | 08/26/2005 | 09:31:04 am (Central) |
| Offline Transmission Time: | | 00:00:01 |
| Number of Requests in Group: | 1 | |
| Number of Lines Charged: | 191 | |

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

Citation                    Search Result          Rank 4 of 20               Database
8/22/05 BOSTONH 4                                                              BOSTONH

8/**22**/05 Boston Herald 4
**2005** WLNR 13214828

Boston Herald (MA)
Copyright (c) 2005 Boston Herald. All rights reserved.

August 22, 2005


Section: News

FBI REPORT: FEDS 'OBSESSED' WITH AGENT; Mob snitch claims **Salemme** lied

Michele McPhee and Laurel J. Sweet

A pivotal witness against jailed FBI agent John J. Connolly Jr. was told he
would "die in prison" if he didn't help "obsessed" prosecutors make their case
against him, according to an FBI debriefing obtained by the Herald.

The witness, former New England gangland boss Francis "Cadillac Frank"
**Salemme**, also boasted that he lied on the stand to appease prosecutors intent on
convicting Connolly, according to a mob snitch debriefed in the 10-page FBI "**302**
" report.

The snitch, onetime Philadelphia Mafia associate Roger "Crazy Roger" Vella
Jr., was jailed alongside **Salemme** in a prison unit for government informants and
soon became **Salemme's** confidant, he told FBI agents.

Prosecutors persuaded **Salemme** to "say what they wanted to hear" about
Connolly, who was being dubbed "public enemy number one" by the feds during his
2002 trial, Vella claimed. Connolly was convicted of taking bribes from the mob
in part on **Salemme's** testimony.

Vella's 2004 FBI debriefings form the basis for Connolly's motion for a new
trial. His case rocked the Boston FBI office with revelations that he and other
agents acted in cahoots with Irish mob boss James J. "Whitey" Bulger to bring
down the Italian Mafia.

Connolly would be the only agent charged in the case. Bulger remains at
large and Connolly is blamed by federal officials for helping him flee.

Attorneys claim in the motion that the government withheld evidence and
coached murderers - Salemme among them - to testify against Connolly at his 2002
trial.


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

8/22/05 BOSTONH 4

Connolly was sentenced to 10 years in federal prison but is currently jailed in Florida facing murder charges in connection with the 1982 slaying of Miami gambling magnate John Callahan.

In Connolly's motion for a new trial, his lawyers focus on claims by Vella that **Salemme** admitted lying on the stand.

During his testimony, **Salemme** said that he paid Connolly twice in 1993 with envelopes stuffed with $5,000 in cash.

**Salemme** allegedly told Vella he would not have paid Connolly because the FBI was "the enemy."

When debriefed by FBI agents John T. Terry and Eric H. Ruona, Vella is quoted as saying: "**Salemme** said he never gave Connolly money because he didn't know the guy. . . . **Salemme** felt that his whole deal with the government hinged on him testifying that he paid Connolly money."

**Salemme** also told Vella prosecutors coached him before his testimony against Connolly, according to the debriefing. "There is no way you can beat these people. They put words in your mouth," **Salemme** allegedly told Vella.

In a separate court document stemming from the case, U.S. Attorney for MassachusettsMichael Sullivan writes "the government believes that much of the information provided by (Vella) is untrue."

But in the past, prosecutors found Vella reliable enough to put him on the stand in a successful double-homicide prosecution. He also agreed to testify for the government against Philadelphia crime boss Joseph "Skinny Joey" Merlino but was not called.

Salemme told Vella that he "got the last laugh by getting back at Connolly and clearing up all his bodies," according to the FBI debriefing. Now he would "get to go home and spend all the money (the government) let him keep," Vella asserts in the report.

Salemme also allegedly told Vella he only allocuted to eight murders when he in fact had participated in 11 hits - including three that are unsolved. Failing to admit to all his murders would constitute a violation of Salemme's cooperation agreement with the government, which garnered him a reduced sentence.

Salemme's attorney, Stephen J. Weymouth, would not comment on the Vella debriefing, which he argued should remain sealed so his client could receive a fair trial on charges of obstruction of justice and making false statements in connection with the murder of a strip club entrepreneur.

But in court last week, Weymouth said: "The government used Frank to secure an indictment against John Connolly. Now, they're calling him a big fat liar."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8/22/05 BOSTONH 4

     Connolly attorney E. Peter Mullane could not be contacted for comment this weekend.

     Copies of the Vella report have been sent to Attorney General John Ashcroft and prosecutors in the Chicago U.S. Attorney's office, which is conducting an "independent review" of Vella's statements, according to the court filings obtained by the Herald.

     The Massachusetts U.S. Attorney's office has been criticized by a Congressional committee for its relationship with Bulger and Stephen "The Rifleman" Flemmi in a 2002 report stating: "When the government strays from the rules of the law, the harm outweighs the benefit. In Boston, this is what happened."

     Sidebar: Ex-agent's basis for new trial; Disgraced FBI agent John J. Connolly Jr., convicted of taking bribes from Boston mobsters, is arguing for a new trial on these grounds, according to a copy of his appeal obtained by the Herald:

     * Mobster Francis "Cadillac Frank" **Salemme** allegedly told a mob confidant he'd never seen prosecutors so "obsessed" with getting someone as when they were going after Connolly, whom they called "Public Enemy No. 1."

     * **Salemme** allegedly said he never met Connolly and could not identify him until prosecutors showed him a picture of the agent the night before he testified.

     * **Salemme** allegedly called Connolly and his informant, fugitive mob boss James P. "Whitey" Bulger, "Irish bums," but said his testimony against the former FBI agent was "his ticket home."

     * **Salemme** allegedly boasted he did not allocute to all the murders he committed in his gangland career, in violation of his federal cooperation agreement.

     * Connolly had once arrested **Salemme** for rigging a Boston attorney's car with a bomb, one of the charges that allegedly prompted the aging wiseguy to remark, "(bleep) Connolly, that guy and the FBI are the enemy." He and his family had suffered for years, **Salemme** allegedly added, "and now it's Connolly's turn."

     Sidebar: Frankly Speaking; Here are some of the highlights of what Roger "Crazy Roger" Vella claimed Francis "Cadillac Frank" **Salemme** told him, according to an FBI debriefing report.

     * **Salemme** was stunned when he discovered that his sidekick, Stephen "The Rifleman" Flemmi was a "rat all those years."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8/22/05 BOSTONH 4

   * **Salemme** said he had no problems with the guys back in Boston because he was testifying against "the enemy." **Salemme** said "guys on the street don't care that he was testifying against an FBI agent," repeatedly insisting, "I ain't no rat."

   * **Salemme** said the FBI "looks like the (expletive) that they are" and wondered, "How do they like it now?"

   * **Salemme** said he could not see his "own kid laid out at his viewing after he died because he was on the run from the law." He sent his girlfriend, Donna Wolf, instead.

   * **Salemme** said the special federal prosecutors he was dealing with were "buttering him up," by giving him books.

   GRAPHIC: TIMELINE:

   1950s:

   Future mob boss and serial killer James 'Whitey' Bulger's nearly half-century reign of terror begins with him cutting his teeth as a bank robber.

   * 1960s:

   Bulger joins Howie Winter's Winter Hill Gang.

   * 1970s:

   Bulger and Stephen 'The Rifleman' Flemmi, who were introduced by Boston FBI Agent John J. Connolly Jr., seize control of the Winter Hill Gang after Winter is incarcerated.

   * 1980s:

   Francis 'Cadillac Frank' Salemme, future godfather of the New England Mafia, survives a hit at a Saugus pancake house by rivals to the La Cosa Nostra throne. New York City's Gambino crime family boss John Gotti orders the Boston mobsters to make peace.

   * 1990s:

   Bulger, Flemmi and Salemme are tipped off by retired FBI agent John Connolly to pending indictments and flee. Bulger is now one of the FBI's Most Wanted futitives.

   * 2002:

   A federal jury finds Connolly guilty of racketeering and obstruction of justice, largely on the testimony of **Salemme.** He is sentenced to 10 years in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8/22/05 BOSTONH 4

federal prison.

 * **2005**:

    Connolly is charged in connection with the 1982 gangland murder of Miami
businessman John Callahan. **Salemme** is arrested on the belief of prosecutors that
he lied about his knowledge of the 1993 murder of Westwood businessman Stephen
DiSarro. Connolly petitions for a new trial in Boston based on an FBI debriefing
of a Philadelphia wiseguy wannabe, Roger Vella Jr., who claims he became
Salemme's confidante while the two were imprisoned together.

                       ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Violent Crime (1VI27); Crime (1CR87); Judicial (1JU36); Legal
(1LE33); Fraud Report (1FR30); Social Issues (1SO05); Criminal Law (1CR79);
Police (1PO98); Government Litigation (1GO18))

REGION:  (Pennsylvania (1PE71); Massachusetts (1MA15); USA (1US73); Americas
(1AM92); Florida (1FL79); New England (1NE37); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AGENT; BOSTON; BOSTON FBI; DISGRACED; FBI; FLEMMI; HERALD;
ITALIAN MAFIA; LA COSA NOSTRA; MASSACHUSETTS U S ATTORNEY; MASSACHUSETTSMICHAEL
SULLIVAN; MOB; RIFLEMAN; SALEMME; SAUGUS; HERALD (THE); WESTWOOD; WHITEY; WINTER
HILL GANG)  (Bulger; Cadillac Frank; Connolly; Donna Wolf; E. Peter Mullane;
England Mafia; Eric H. Ruona; Failing; Francis; Frank; Howie Winter; James; John
Ashcroft; John Callahan; John Connolly; John Gotti; John J. Connolly Jr.; John
T. Terry; Jr.; Mobster Francis; Philadelphia; Philadelphia Mafia; Roger Vella;
Stephen; Stephen DiSarro; Stephen J. Weymouth; Vella; Vella Jr.; Weymouth;
Winter)

EDITION: Third

Word Count: 1684
8/**22**/05 BOSTONH 4

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Rat: Tips foiled feds' efforts to nab Whitey

Federal officials knew where James J. "Whitey" Bulger was hiding out in New York City on several occasions, but the fugitive killer was "tipped off each time before he could be arrested," Francis "Cadillac Frank" Salemme told a fellow inmate, according to an FBI report obtained by the Herald.

"Bulger is a master of disguises and an expert with electronicals (sic)," Salemme allegedly told Roger "Crazy Roger" Vella Jr., a fellow government witness befriended by the ex-New England mob boss while the pair were doing time in the WITSEC, or witness protection unit of a federal pen. According to Salemme, "Bulger was tipped off when he was in New York," Vella told FBI agents in a 10-page "302" debriefing conducted with the snitch last year.

Salemme's attorney, Stephen J. Weymouth, said Vella — a "cooperating suspect" spilling his guts to the FBI about Salemme — is nothing but a wannabe wiseguy who is making up stories about his client.

Weymouth would not discuss the FBI report, citing a court order that is expected to keep the explosive document under seal until today, but said he plans "to talk to Frank" about the allegations Vella made to FBI agents.

Vella "is not credible. He was not a made man. He was not part of the inner circle. It's going to be very easy to show that what he was saying is simply just not true," Weymouth said yesterday.



**ANIMAL: Hub mob fugitive James 'Whitey' Bulger cradles a goat in an undated photograph obtained by the FBI. According to documents obtained by the Herald, mob snitch Roger Vella Jr. claims Bulger was tipped off before the FBI could arrest him in New York City.**

**Stories from Laurel J. Sweet and Michele McPhee**

Salemme's trial on obstruction of justice and making false statements charges in connection with the 1993 murder of Westwood strip club owner Stephen DiSarro is expected to begin in six months. Vella is expected to be called as a witness in that case, prosecutors said.

The report says Vella and Salemme became friendly over football games, walks in the prison yard, and by trading true crime books — including one that mentions Salemme and that he autographed for another inmate.

"Salemme told (Vella) that he is a 'gangster' and that he could have seen Vella in the mob 50 years ago," the report stated.

Salemme was also chatty about his criminal activities in Boston, according to the report. He recounted the shootings outside Bickfords Pancake House on Route 1 in Saugus that left him shot in the stomach, and talked about growing up in Roxbury with Stephen "The Rifleman" Flemmi.

Salemme "loved to kill" and had to "kill his way up" to become the boss of Boston's La Cosa Nostra, obtaining "great satisfaction out of burying people so they couldn't be found," Vella told the feds.

"On one occasion, Flemmi chopped a guy's head off," Salemme allegedly boasted to Vella. "Flemmi was a real tough guy."

## Judge probes leak of FBI debriefing

A federal judge yesterday ordered the U.S. Attorney for Massachusetts to turn over a list of everyone his office knows had access to an "inflammatory" FBI debriefing, which was sealed under court order but revealed exclusively in yesterday's Herald.

According to a 2004 disclosure document from U.S. Attorney Michael Sullivan, which has also been obtained by the Herald, 26 high-ranking authorities had access to the document in question. Six of those officials were members of Sullivan's staff. In addition, other FBI agents and law-enforcement officials are believed to have seen the so-called "302" report, among them former U.S. Attorney General John Ashcroft.

The 10-page debriefing of wiseguy wannabe Roger "Crazy Roger" Vella Jr., 34, a reputed legbreaker and debt collector for the Mafia in Philadelphia, details conversations Vella allegedly had with former New Eng-

land godfather Francis "Cadillac Frank" Salemme. The talks took place while the pair were imprisoned together in a secret federal pen for mob snitches.

According to Vella, Salemme, whose testimony in 2002 helped put former FBI agent John J. Connolly Jr. in jail for 10 years for getting too cozy with the mobsters he was entrusted to control, boasted of lying on the witness stand.

U.S. District Court Judge Richard G. Stearns said yesterday he would release the "302" report — an exhibit supporting Connolly's motion for a new trial — today.

Blacked out, however, will be Salemme's alleged chest-beating to Vella that he had to "kill his way up" to become a La Cosa Nostra boss, and that he "loved to kill" and bury people so they could not be found.

Stearns dismissed the passage as "gratuitously inflammatory."

— LAUREL J. SWEET AND MICHELE MCPHEE



**HENRY HILL**    AP FILE PHOTO

## WISEGUY COOK IN HOT WATER

NORTH PLATTE, Neb. — Former mobster-turned-chef Henry Hill, whose experiences inspired the 1990 gangster flick "GoodFellas," has been found guilty of attempted possession of methamphetamine, a misdemeanor.

Police said glass tubes were found in Hill's luggage at the North Platte Regional Airport last August and tests showed two of the tubes contained meth and cocaine residue. Sentencing was set for Sept. 26.

Hill, 62, played by Ray Liotta in "GoodFellas," sought refuge in the witness protection program after agreeing to testify against his former mob bosses from New York. He later left witness protection, moved to Nebraska and now is helping start an Italian restaurant. Hill also wrote "The Wiseguy Cookbook," released in 2002.

ASSOCIATED PRESS

## Connolly says snitches tainted his trial

"The government cannot have its cake and eat it too."

That is one of the key arguments made in John J. Connolly Jr.'s motion for a new trial, saying his 2002 conviction was "constructed upon the fabrication testimony of career violent criminals who are always willing to tell any story, about any person, provided there is something in it for them."

One of those career criminals in Connolly's 2002 trial was Francis "Cadillac Frank" Salemme, touted by the U.S. Attorney's office in Massachusetts as a credible witness. Salemme's testimony helped convict Connolly of racketeering and obstruction of justice charges.

Those same prosecutors have since charged Salemme with lying in connection with the 1993 murder of a Westwood strip club owner, Stephen DiSarro. "The government used Frank to secure an indictment against John Connolly," said the ex-FBI agent's attorney, Stephen J. Weymouth. "Now they're calling him a big fat liar."

Another mob snitch, Roger "Crazy

Roger" Vella Jr., is set to testify against Salemme, a former fellow con, at his upcoming trial.

But in another court document under seal, U.S. Attorney Michael Sullivan said his office "believes that much of the information provided by (Vella) is untrue."

The use of murderers as witnesses was the subject of a 2003 congressional report: "Everything Secret Degenerates: The FBI's Use of Murderers as Informants."

During the hearings, U.S. Rep. Stephen F. Lynch (D-S Boston) slammed federal prosecutors and the Boston FBI for refusing to disclose lies made and crimes committed by their star witnesses — Joseph "Joe the Animal" Barbosa, James J. "Whitey" Bulger and Stephen "The Rifleman" Flemmi — because to do so would have jeopardized the convictions of La Cosa Nostra members in New England.

But, Lynch said, coming clean on the mob killers turned snitches "would have jeopardized the careers of those law enforcement officials that advanced themselves" by using their testimony.



**HARD TIME: The testimony of convicted criminals helped convict former G-man John J. Connolly Jr.**    AP FILE PHOTO