UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No: 05-10140-RGS |
| ) | |
| THOMAS M. FINNERAN, ) | |
| Defendant ) | |

**MOTION TO WAIVE PRESENTENCE INVESTIGATION
AND MEMORANDUM IN SUPPORT**

Defendant Thomas M. Finneran recently agreed to enter a plea of guilty to a portion of Count Four of the indictment, alleging that he obstructed justice. He now seeks to waive any rights he may have to a presentence investigation and/or a presentence report, and respectfully requests that this Court proceed directly to sentencing. As such, he files this assented-to[1] motion pursuant to Fed.R.Crim.P. 32(c)(1)(A)(ii).

I.   **Procedural History**

Mr. Finneran is charged with three counts of perjury and one count of obstruction of justice. The charges stem from testimony he gave in a civil case about the 2001 redistricting of legislative districts in the City of Boston.

In accordance with a plea agreement with the United States, Mr. Finneran has agreed to plead guilty to a portion of Count Four, which alleges that he obstructed justice when he testified that he did not review any "redistricting plans" prior to the time that the House of Representative's Redistricting Committee filed its plan with the House Clerk. In the plea agreement, the parties agree that under the Sentencing Guidelines, Mr.

---

[1] The United States assents to the motion but takes no position on the facts recited herein.

1

Case 1:05-cr-10140-RGS    Document 31    Filed 01/05/2007    Page 2 of 11

Finneran's base offense level is 14 and that he is eligible for a two level reduction for acceptance of responsibility. They further agree that "there is a basis for a sentence outside the Guidelines under the factors set forth in 18 U.S.C. § 3553(a)..." and that the appropriate sentence, in light of relevant factors, including his exemplary public service, is 18 months unsupervised probation, a $25,000 fine, and a mandatory special assessment of $100.

## II. The Record Permits this Court to Forego Ordering a Presentence Investigation.

A presentence investigation is not required so long as this Court "finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record." Relevant information under 18 U.S.C. § 3553 includes information about who the defendant is as a person, such as his family life, education, and accomplishments. Here, to assist in sentencing, Mr. Finneran provides this Court with the following information:

### Mr. Finneran's Education

Mr. Finneran did not come from a wealthy or privileged family. Rather, he was one of seven children, raised in a working class, blue collar family. He grew up in the Lower Mills section of Dorchester, where he attended the neighborhood public schools. From the time he was fourteen years old until he graduated from law school, he worked for his father's business, cleaning rugs and upholstery.

Following his graduation from Boston Latin School, Mr. Finneran attended Northeastern University, where he obtained a degree in business administration, with an emphasis in finance. After he graduated in 1973, he spent a year attending to family issues, as his parents were divorcing after more than thirty years of marriage.

Mr. Finneran went on to law school at Boston College Law School, where he graduated in 1978. As he studied for the bar exam, he began an earnest campaign for what turned out to be a long and distinguished career in public service.

### Mr. Finneran's Family Life

Shortly after graduating from Northeastern, Mr. Finneran married his wife, Donna. Mr. Finneran is a devoted family man and has been married for more than thirty years.

He and Donna have two grown, successful children. His eldest daughter, Kelley, is a recent law school graduate who works at Choate Hall in Boston. She and her husband (also a lawyer), reside in East Milton. The Finnerans' second daughter, Shannon, and her husband reside in Braintree. Shannon recently gave birth to a daughter, Reagan, and is employed by the Commonwealth of Massachusetts as a bank examiner. The Finnerans remain close with their daughters and they spend considerable amounts of time together.

The Finnerans raised their daughters in the Mattapan section of Dorchester, a racially diverse, inner city neighborhood. Mr. Finneran and Donna still reside in Mattapan today.

### Mr. Finneran's Long and Distinguished Legislative Career

Mr. Finneran's legislative career -- spanning twenty-five years – was one of great success and integrity. He served as chairman of powerful committees, such as the Committee on Banking and the Ways and Means Committee. And in 1996, his peers elected him to be Speaker of House, a position he held until he resigned in October, 2004.

3

Case 1:05-cr-10140-RGS   Document 31   Filed 01/05/2007   Page 4 of 11

In more than two decades in the House of Representatives, no allegations of impropriety or claims of corruption were made against Mr. Finneran. Indeed, he was widely acknowledged and respected as an exemplary public servant and a leader of unquestionable integrity, devotion and talent.

In the early years of his public service, he endured at least two hard-fought, racially-charged elections. By 1978, the year he first ran for office, his neighborhood in the Mattapan section of Dorchester was experiencing "white flight" and it was becoming a segregated neighborhood with a very large African-American population. Undaunted by the racial tensions of the day, Mr. Finneran campaigned in every part of the neighborhood, reaching out to all its residents and committing himself to furthering their interests, no matter their race, background or ethnicity.

He won his first election by a respectable margin, and began serving as a representative in January of 1979. His next two elections were difficult ones. Despite what many would perceive as a disadvantage – a white, Irish Catholic candidate running in a "majority-minority" district – Mr. Finneran never wavered from his obligations to his constituents and attended countless neighborhood meetings and visited each and every precinct. Through his hard work and attention, Mr. Finneran convinced the voters of Dorchester/Mattapan that he was committed to representing their many interests with honesty, integrity, and hard work. The voters responded by electing him year after year.

By the mid-1980's, Mr. Finneran's reputation as a talented representative started to soar. In 1985, he was appointed as Chairman of the Committee on Banking. As he gained statewide attention, he made the conscious decision to seek campaign funds from

Case 1:05-cr-10140-RGS     Document 31     Filed 01/05/2007     Page 5 of 11

largely outside his neighborhood, not wanting to burden his working-class constituents by seeking political contributions from them.

Mr. Finneran used his powerful position to improve the quality of life and opportunities in his home district of Dorchester/Mattapan and throughout Boston's urban neighborhoods. For example, when Mr. Finneran began his work as Chairman of the Committee on Banking, banks were routinely refusing to loan money to would-be home buyers seeking to purchase homes in inner city neighborhoods such as Mattapan and Roxbury. Nationwide, banks were successfully defeating legislation aimed at curbing such practices. But the banks did not succeed in Massachusetts. Indeed, under Mr. Finneran's guidance, the Committee on Banking passed the Community Reinvestment Act. Under that legislation, banks were required to make mortgage loans in areas from which they drew deposits. The Massachusetts law set the national stage, and other states subsequently succeeded in passing similar laws.

Following his chairmanship of the Committee on Banking, in January of 1991, Mr. Finneran went on to become the Chairman of the Ways and Means Committee, a demanding and time-consuming position he held until he was elected as Speaker of the House in April of 1996. While he was Chairman of the Ways and Means Committee, he put his political power to good use. In the late 1980's and early 1990's, crime was quickly becoming an increasing problem in the inner city with the proliferation of guns, drugs, and gangs. Mr. Finneran saw his own neighborhood and district affected. He heard from families who were afraid to let their children play in the streets and parks of their own neighborhoods. At a time when the Commonwealth was experiencing a dire fiscal situation, Mr. Finneran nevertheless worked hard to secure funding for community

policing. Although the governor vetoed the legislation the first year, Mr. Finneran pushed the legislation the following year, and it became law. Under the program, funds are spent in neighborhood "hot spots" with high crime rates. Today, the program receives approximately $20,000,000 in annual funding.

While he was Speaker, the City faced a similar problem with increased crime in the "Morton/Talbot corridor" section of the Dorchester/Mattapan neighborhoods in Boston. The community was faced with numerous shootings and homicides, and Boston police officials enlisted Mr. Finneran's assistance. He responded in two ways. First, he ensured that funds were allocated for extra police patrols in the affected neighborhoods. Second, he ensured that funds were allocated for the summer jobs program, which had been an essential tool for helping Boston's youth to succeed, and also to combat crime, by providing youths with access to gainful employment and opportunities they might not otherwise have. Consequently, the spate of violent crimes was slowed.

Also while Speaker of the House, Mr. Finneran became interested in early childhood education and literacy. He worked with the Boston Medical Center to establish a program -- "Reach Out and Read," the first such literacy program in the nation -- where books were donated to pediatricians' offices throughout the city; the pediatricians, in turn, gave the books to children and encouraged their parents to read to them. As Speaker, Mr. Finneran was able to obtain public funding for the program. He also personally participated, visiting community health centers and reading to children, and worked to improve the program's visibility. Building upon the Reach Out and Read program, Mr. Finneran successfully expanded kindergarten literacy programs and expanded kindergarten from a part-day to a full-day program.

Over the years, Mr. Finneran's public servitude has been also marked by many examples of his commitment to serving Boston's urban residents, and not only those who resided in his own district. Throughout his many terms in the House of Representatives, Mr. Finneran was an avid supporter of the Ward Fellows Program at Boston Latin School. The Ward Fellows Program, among other things, placed students in internships in the public sector. Mr. Finneran continually took on interns from the Program, paying them out of his own campaign funds so that the Program could conserve its own funds. Many of Mr. Finneran's interns went on to college and successful careers of their own.

Mr. Finneran also ensured that minority candidates were given ample employment opportunities at the State House. His own staff, which grew to considerable numbers after he was appointed as Chairman of the Ways and Means Committee and later as Speaker of the House, had significant minority members. While he was chairman of the Ways and Means Committee, he made sure that a significant numbers of his budget analysts – approximately one-half – were minorities. The experience that those employees garnered helped to lay the groundwork for their futures, and many went on to obtain graduate degrees and further successes. Mr. Finneran also appointed minorities to other important state jobs. For example, when he took over the Ways and Means Committee, he recognized the hard work and talent of Patricia Wynn, an African-American woman, and elevated her to counsel to the committee. He later appointed her to the board of the Massachusetts Convention Center Authority. After he became Speaker, he appointed Keith Johnson, who had been a budget analyst, as the first African-American Personnel Administrator for the House of Representatives, and promoted Rodney Bender, also an African-American, as head of his constituent staff.

Mr. Finneran's service was also marked by his commitment to fairness and justice. For example, in the 1980s, in spite of his reputation as a socially conservative legislator, he went to great lengths to assist Bobby Joe Leaster, an African American man who had been wrongly convicted of murder. Mr. Finneran was responsible for passing legislation which ensured that Mr. Leaster – his ability to provide for himself and his family marred by nearly twenty years of wrongful imprisonment – received a modest annuity. His experience with Mr. Leaster's case also formed the basis for his stance against the death penalty, as he recognized that there was a very real potential for an innocent man to be condemned to death.

### Mr. Finneran's Charitable Good Deeds

Throughout the years, Mr. Finneran devoted his time and talents to charitable works. For example, early in his legislative career, Mr. Finneran volunteered to serve on the advisory board for the Dorchester YMCA, which, at times, was in or outside of his district, depending upon the redrawing of district lines during redistricting. He stayed on the board, or was otherwise involved, for many years, impressed by the importance that the organization had played in his life and the lives of so many of Dorchester's youth. Starting when he was appointed as Chairman of the Ways and Means Committee and then as Speaker of the House, Mr. Finneran used his public stature to greatly help the YMCA. He took the time to organize and host annual fundraisers for the YMCA, bringing in many contributors, and helping to raise thousands and thousands of much-needed dollars.

In 2002, a group of Mattapan community leaders, interested in providing neighborhood youth with meaningful opportunities in the after-school hours, tried to

Case 1:05-cr-10140-RGS   Document 31   Filed 01/05/2007   Page 9 of 11

establish Pop Warner football and cheerleading programs. Mr. Finneran learned that, despite the leaders' efforts to raise funds, they had been unable to get the programs off the ground. Determined to see the programs' success, Mr. Finneran personally stepped in and donated the $5,000 needed to get them started. And when he learned that the community leaders had been unable to secure a location for the programs' practices and games, Mr. Finneran intervened, calling the President of Curry College, who agreed to allow the programs to use Curry's football field. The programs are still running and have had a positive and constructive impact on many young people from the area.

Mr. Finneran's commitment to Boston's urban neighborhoods did not waiver over the years. In 2004, Mr. Finneran was directly responsible for funneling money to organizations in the Codman Square and Mattapan neighborhoods when a community investment foundation enlisted his help in awarding funds to deserving institutions. Recognizing their important good works, Mr. Finneran recommended that the foundation contribute to the Mattapan Community Health Center, the Codman Square Health Center, and the Mattapan Community Development Corporation. As a result, these institutions, providing invaluable services to their neighborhoods, received tens of thousands of dollars in funding.

### The Circumstances Surrounding the Offense Conduct

Finally, Mr. Finneran directs this Court's attention to the circumstances surrounding his testimony in the redistricting case.

On the day he testified, November 14, 2003, Mr. Finneran and his wife were both faced with serious medical issues. In the days leading up to his testimony, Mr. Finneran suffered constant pain in his left hip as result of severe degenerative changes and

Case 1:05-cr-10140-RGS    Document 31    Filed 01/05/2007    Page 10 of 11

osteoarthritis. The pain was so intense that he told the doctors it was an "8" on a scale of 1 to 10. The pain caused him to limp and overall, it inhibited his mobility, and even his ability to put on his socks and shoes. Just days before he testified, he learned that he required a total hip replacement of his left hip. The surgery was not performed, however, until nearly a month after he testified.

On the day of his testimony, he was also distracted by his wife's serious medical issues. She had been experiencing burning, sharp pain and swelling in her knee. Earlier that day, Mr. Finneran had dropped her off at Massachusetts General Hospital, where she underwent an MRI and medical evaluation; the results of the testing revealed that she had severe degenerative changes in her knee, loss of cartilage, and a complex tear of her medial meniscus as well as a tear of her lateral meniscus. While he was testifying, Donna waited for him at the hospital.

### III. Conclusion

With these circumstances in mind, this Court has a more than adequate record to impose the appropriate sentence. As such, Mr. Finneran urges this Honorable Court to forego ordering a presentence report and proceed directly to sentencing.

Respectfully submitted,
Thomas M. Finneran,
By his attorneys,

/S/ Richard Egbert   per RE
Richard M. Egbert, Esq. BBO: 151800
Patricia A. DeJuneas, Esq. BBO: 652997
Law Offices of Richard M. Egbert, P.C.
99 Summer Street, Suite 1800
Boston, Massachusetts 02110
(617) 737-8222

## CERTIFICATE OF SERVICE

    I, Richard M. Egbert, Esquire, hereby certify that I caused a copy of the foregoing document to be served upon John T. McNeil, Assistant United States Attorney, United States Department of Justice, One Courthouse Way, Suite 9200, Boston, Massachusetts 02110 on this 3rd day of January. 2007.

_____
Richard M. Egbert, Esq.

11